UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IRENA MERNIK KNEE and JAMES KNEE, in
their individual capacities and on behalf of their
minor daughter, ISABELLA KNEE,

                         Plaintiffs,

            -against-

ROUND DUNE, INC., SARA SHEIMAN,
STEPHEN ROTH, STEPHEN DEUTSH, GALE
SPITALNIK, NEIL BERMAN, MICHAEL
KATES, JOYCE DOYLE, FRANK LERNER,
STEPHEN MITZNER, JENNIFER SAFIAN,
ELLIOT RATCHIK, MARTHA FRIEDRIKS,
GREG BRANDNER, MARTIN KANTOR,
DOMINICK PEPPACENO,

                         Defendants.
------------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**

15-CV-5766 (JMA) (ARL)

**AZRACK, United States District Judge:**

Before the Court is defendants' motion for judgment on the pleadings, seeking to dismiss two of plaintiffs' federal claims as untimely.   For the reasons that follow, defendants' motion for judgment on the pleadings is converted to a motion for summary judgment, and the motion is granted on the two federal claims at issue.   The Court declines to exercise supplemental jurisdiction over plaintiffs' two analogous state laws claims and dismisses those claims without prejudice.

## I.   BACKGROUND

### A.   Factual Background

In 2009, plaintiff Irena Mernik Knee ("Mernik Knee") inherited two apartments in a seasonal apartment complex owned and operated by defendant Round Dune, Inc. (the "Co-op").

Mernik Knee inherited the shares and proprietary leases pertaining to the apartments from her late husband, Gilbert Kraus.    Mernik Knee presently occupies the apartments with her current husband, plaintiff James Knee.    (Decl. of Irena Mernik Knee ("Mernik Knee Decl.") ¶¶ 5–6, ECF No. 24.)    Mernik Knee was born in Slovenia and immigrated to the United States in 1997. (Mernik Knee Decl. ¶¶ 2, 4.)

Mernik Knee inherited the shares pursuant to a global settlement of Kraus's estate.    In June 2009, the Co-op's Board of Directors (the "Board") informed the Knees that they needed to receive Board approval in order for Mernik Knee to inherit the shares from Kraus's estate. (Mernik Knee Decl. ¶ 5; Decl. of James Knee ("James Knee Decl.") ¶¶ 3–5, ECF No. 23.)    The Board's own proprietary lease specifically exempts a deceased shareholder's spouse from obtaining Board approval before inheriting shares.    (James Knee Decl. Ex. 9, ECF No. 23.)

In March 2009, the Knees submitted an application for this approval, supported by financial disclosures and personal letters of reference.    (James Knee Decl. ¶ 4.)    As part of the approval process, the Board conducted an in-person interview with the Knees.    (Id. ¶ 5.)    The Knees maintain that, in June 2009, the Board informed them that their application had been approved. (Id. ¶ 3.)    At this time, the shares were still held in Kraus's estate and had not yet been transferred to Mernik Knee.    (Id. ¶ 6.)

After granting approval, the Board requested that the Knees transfer the shares out of Kraus's estate and into a trust in which Mernik Knee was the sole beneficiary.    (Id.; Am. Compl. ¶ 48, ECF No. 6.)[1]    The Knees did not do so.    (James Knee Decl. ¶ 18.)    Throughout the

---

[1] The Court relies on the amended complaint only to the extent it contains background information which neither party disputes.

summer of 2012, the Knees received monthly letters from the Board requesting that the shares be transferred out of Kraus's estate.    (Id. ¶ 8.)    At some point, likely in 2012, the Board demanded additional financial disclosures from the Knees.    (James Knee Decl. Ex. 11 ¶¶ 16–17; Aff. of Jacqueline Aiello ("Aiello Aff.") Ex. 5 ¶ 43, ECF No. 19.)    According to the Knees, the Board also revoked the approval to inherit the shares that the Board had previously granted Mernik Knee in 2009.    (Mernik Knee Decl. ¶ 11.)

In the instant suit, the Knees claim that the Board's requirements for approval, additional financial disclosure, and share transfer were discriminatory.    As discussed further infra, essentially, the critical question before the Court is when the Knees' claims accrued.    The facts concerning the Knees' knowledge of their potential claims are discussed below.

On July 11, 2012, the Knees submitted a letter to the President of the Co-op's Board signed by James Knee.    (Aiello Aff. Ex. 4; Mernik Knee Decl. ¶ 8.)[2]    In this letter, plaintiffs wrote:

> As we asked for sufficient time to make this process easy for us and were denied, I ask . . . why do others at Round Dune get a pass? Why were the Gottlieb units in an Estate Name for So Many years? I know the Jurgens unit has been in an Estate for a few years now! Somehow we feel discriminated against!!! Singled out!!!

(Aiello Aff. Ex. 4, 1.)    Unlike Mernik Knee, the heirs of the Gottlieb family are Jewish and American citizens.    (Letter dated September 12, 2013, Aiello Aff. Ex. 6; Am. Compl. ¶¶ 1, 65.)

On November 9, 2012, the Board filed suit against the Knees in New York State Supreme Court, Suffolk County, seeking to have the shares transferred out of Kraus's estate and directing Mernik Knee to submit additional financial disclosures to inherit the shares.    (James Knee Decl. Ex. 11 ¶¶ 14–18.)    On December 28, 2012, the Knees filed an answer and counterclaim for breach

---

[2] Plaintiffs do not challenge the authenticity of this letter.

3

of contract.    In their counterclaim, plaintiffs alleged:

> 39. The language and intention of the Proprietary Leases is to provide special consideration to the surviving spouse, whereby rights are vested in the surviving spouse without interference or the necessity to negotiate with [the Board].

> 40. [The Board] has acted in an arbitrary and capricious manner, whereby contrary to the express provisions of the Proprietary Leases and By-Laws, IRINA MERNIK-KNEE has been singled out for <u>disparate treatment</u> by [the Board].

> 41. <u>[The Board] has not imposed time limits upon the ownership of shares and leases by other estates, and has permitted at least one estate to remain in title to shares and leases for more than ten years after the record shareholder's death</u>.

> 42. In breach of the governing Proprietary Leases, [the Board] has demanded that IRINA MERNIK-KNEE apply for board approval of the transfer of her deceased husband's Shares to her name.

> 43. In further breach of the governing Proprietary Leases, after granting its unnecessary consent to the transfer of the Shares in 2009, [the Board] has subsequently revoked its consent and demanded the disclosure of further financial information from IRINA MERNIK-KNEE.

(Aiello Aff. Ex. 5 ¶¶ 39–43 (emphasis added).)    The state court action is still ongoing.

On September 12, 2013, the Knees submitted another letter to the President of the Board.[3]

(Aiello Aff. Ex. 6.)    In this letter, plaintiffs wrote:

> There have been Estates that have held shares at Round Dune, Inc. for more than a decade.   Why were the Estates of Edelstein and Gottlieb allowed to hold shares for so long? Was it that their heirs were of the correct age, religion and national heritage? It is true that Gilbert Kraus died in 2004. However his Estate has only been in the position to transfer for four years, considerably less time than others you have allowed to hold shares in an Estate. Why was there no lawsuit filed against The Estate of David Edelstein or Gottlieb for failure to transfer shares? We know this to be true because Round Dune, Inc. financial statements in the past have not shown these litigation contingencies in the notes sections. You have viciously singled us out to show how tough the Board is at Round Dune. The Board has repeatedly requested from Irena, the surviving spouse, to go before the Board for approval. It took unnecessary and expensive litigation for you to admit as per the Propriety[sic] Lease that no Board consent is required for her to inherit. Yet, we

---

[3]    Again, plaintiffs do not challenge the authenticity of this letter.

both went in front of the Board in 2009 and were approved, for both, C3 and C4 apartments! Furthermore, the Board and Michael Cohen have asked again and again for copies of the Will and of the Stipulation Agreement, only because nobody keeps chase and files of documents and activities of previous Boards. You stripped us of our privacy and backed us into a corner, giving us no option but to fight for our home. Is this any way for a Board of Directors of a Co-op to act?

(Id., 2.).    Like the Gottlieb heirs, the Edelstein heirs are also Jewish and American citizens.    (Id.; Am. Compl. ¶¶ 1, 65.)

In addition to the favorable treatment accorded to the Gottlieb and the Edelstein heirs, the Knees also maintain that the Board treated another resident, Mrs. Dori, more favorably than the Knees when the Board did not require Mrs. Dori to receive board approval when she inherited her late husband's shares in her apartment.    (James Knee Decl. ¶¶ 40–43.)    Mrs. Dori, who is also referred to as the "C-5 Widow," is Jewish and an American citizen.    (Am. Compl. ¶ 44.)    The Knees claim they only learned about Mrs. Dori in February 2015 through documents that were produced during state court discovery.    (James Knee Decl. ¶¶ 40–43; Mernik Knee Decl. ¶ 18.)

In opposing defendants' motion, the Knees submitted their own affidavits concerning their knowledge of the relevant facts at issue.    In their declarations, the Knees do not dispute that they knew about the Gottliebs and the Edelsteins at the time the July 2012 and September 2013 letters were written.    (James Knee Decl. ¶¶ 19 ("It was an open secret at Round Dune that the Gottliebs were allowed to keep their shares in the estate for what I thought was a long time, so I wondered why we were being treated differently from the Gottliebs."), 35 ("In fact, although I had heard that the Edelstein apartment was an estate situation, I had no ability to verify it, and in its response to our counterclaims the Co-op denied that any apartment remained in an estate for more than ten years."); Mernik Knee Decl. ¶¶ 7–10 (discussing the July 2012 letter), 15–17 (discussing the September 2013 letter).)    They also do not dispute that they had knowledge of the facts

5

underlying the allegations in their state court counterclaim at the time they filed their answer. (James Knee Decl. ¶¶ 22–27 (discussing the counterclaim); Mernik Knee Decl. ¶¶ 11–14 (same).)

The Knees, however, do attest that they were not aware of the Board's intent to discriminate against them based on their religion, ethnicity, and citizenship status at the times the letters were sent and the state court answer was filed.   (James Knee Decl. ¶¶ 20, 26, 28, 34, 45; Mernik Knee Decl. ¶¶ 7–8, 17–18.)   The Knees assert that they only became aware of this discriminatory intent when they "started to see a pattern" in the Board's behavior after documents produced in state court discovery in 2015 revealed the existence of the C-5 Widow and confirmed that the Edelstein shares were held in estate for more than ten years.   (James Knee Decl. ¶¶ 39–45; Mernik Knee Decl. ¶¶ 18–20.)

## B.  **Procedural History**

Plaintiffs filed their initial complaint against defendants on October 6, 2015.[4]    (ECF No. 1.)   The initial complaint alleged familial discrimination arising out of the Co-op's pool policy. On January 13, 2016, plaintiffs amended their complaint to allege that the Board had also discriminated against them based on religion, ethnicity, and citizenship status in the circumstances surrounding Mernik Knee's inheritance of her late husband's shares and lease.   (ECF No. 6.) The amended complaint's first two causes of action relate to plaintiffs' pool claim.   Plaintiffs' third and fourth causes of action allege that the Board discriminated against them when it required plaintiffs to obtain approvals to inherit the shares (the "Board Approval Claim").   Plaintiffs' fifth and sixth causes of action allege that the Board engaged in discrimination when it required that

---

[4]  With the exception of Dominick Peppaceno, the individual defendants are all members or former members of the Co-op's Board.    Plaintiffs do not bring claims involving Mernik Knee's inheritance against Peppaceno.

plaintiffs transfer the shares out of Kraus's estate (the "Estate Claim").    Plaintiffs bring these claims under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 et seq., and analogous provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law, §§ 290 et seq..

In April 2016, defendants requested a pre-motion conference before this Court concerning their proposed partial motion for judgment on the pleadings.    (ECF Nos. 12 & 13.)    The Court held a pre-motion conference attended by all parties on May 12, 2016.    (ECF No. 15.)    At the pre-motion conference several of the documents relied on by defendants were discussed at length. (Id., FTR 3:26:30–3:35:30.)    Regarding the inheritance claims, the Court set a briefing schedule for defendants' motion to dismiss the third through sixth causes of action as untimely.    (Id.)    In addition, the Court permitted discovery on plaintiffs' claims regarding the pool policy to proceed. (Id.)

## II.    DISCUSSION

### A.    Standard for Converting a Motion to Summary Judgment

"A district court must convert a motion for judgment on the pleadings to one for summary judgment if the motion includes material 'outside the pleadings' and that material is 'not excluded by the court.'"    Sira v. Morton, 380 F.3d 57, 66 (2d Cir. 2004) (quoting Fed. R. Civ. P. 12(c)). First, the Court determines whether the parties rely on material outside of the pleadings in their submissions.    Then the Court addresses whether the motion for judgment on the pleadings should be converted to one for summary judgment.

#### 1.    Materials Outside of the Pleadings

On a 12(c) motion, a Court may consider only written instruments attached to the complaint, materials incorporated in the complaint by reference, and documents that are integral

7

to the complaint.  Id. at 67.   In this case, defendants attached to their motion: (1) the July 11, 2012 letter, (2) the December 28, 2012 state court answer, and (3) the September 12, 2013 letter. In response, plaintiffs submitted, inter alia, declarations from plaintiff Irena Mernik Knee and plaintiff James Knee.   The Court may take judicial notice of the December 2012 state court answer.  Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).   None of the remaining documents were attached to the parties' pleadings nor incorporated by reference in the complaint.

Defendants argue that the two letters they offer are integral to the complaint and so, are properly considered on a Rule 12(c) motion.   A document is "integral" where "the complaint relies heavily upon its terms and effect . . . ."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).   Letters admonishing defendants for past actions are not integral to a complaint alleging harm caused by the actions themselves.   See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 124 (S.D.N.Y. 2010) (finding that affidavit and emails discussing contract were not integral to breach of contract claim when contract itself was attached to the complaint); cf. Chambers, 282 F.3d at 154 (holding that industry's model code regarding working conditions was not integral to complaint alleging copyright infringement where it was not clear whether model codes were incorporated into the contractual relationship between the parties); Sira, 380 F.3d at 67 (finding that hearing transcripts were not integral to inmate's complaint alleging that he was deprived of liberty without adequate notice of the charges against him).   This is especially true where the complaint makes no reference to the attached letters, lacks any quotations from the letters, and there is no reason to suspect that plaintiffs relied on the letters in

8

drafting their complaint.   See Chambers, 282 F.3d at 154; Madu, Edozie & Madu, P.C., 265

F.R.D. at 124.   Accordingly, the Court concludes that the July 2012 and September 2013 letters

are not integral to plaintiffs' complaint.

### 2.   Conversion to Summary Judgment

A Court presented with material outside of the pleadings has two options: the Court can

exclude the extrinsic documents from consideration and rule on the motion for judgment on the

pleadings, or the Court can convert the motion to one for summary judgment and give the parties

an opportunity to obtain and present evidence.   Chambers, 282 F.3d at 154.   A court need not

provide additional time for discovery where the non-movant "should reasonably have recognized

the possibility that the motion might be converted into one for summary judgment [and was not]

taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings."

Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) (citation omitted).   "A party cannot

complain of lack of a reasonable opportunity to present all material relevant to a motion for

summary judgment when both parties have filed exhibits, affidavits, counter-affidavits,

depositions, etc. in support of and in opposition to a motion to dismiss . . . ."   M.J.M. Exhibitors,

Inc. v. Stern (In re G. & A. Bokos, Inc.), 770 F.2d 288, 295 (2d Cir. 1985); Sira, 380 F.3d at 68

("By attaching to their motion extensive materials that were not included in the pleadings, [the

parties] plainly should have been aware of the likelihood of . . . a conversion [to summary

judgment].").   Under such circumstances, formal notice that a motion to dismiss might be

converted to a motion for summary judgment is not required.   Hernandez v. Coffey, 582 F.3d

303, 307 (2d Cir. 2009).

Since the pre-motion conference held on May 12, 2016, the parties have had ample

opportunity to submit material outside of the pleadings and, in fact, did so, filing numerous exhibits in support of and opposition to the motion.    Moreover, as discussed below, the critical question on the instant motion concerns plaintiffs' knowledge—plaintiffs do not need additional discovery to counter defendants' submissions on that issue.    Accordingly, the Court converts defendants' motion for judgment on the pleadings to one for summary judgment.

**B.    Standard for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986).    The movant bears the burden of demonstrating that "no genuine issue of material fact exists."    Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).    "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"    Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).    To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a

genuine issue for trial.'"    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).    The

nonmoving party, however, "must do more than simply show that there is some metaphysical

doubt as to the material facts."    Id. at 586 (citations omitted).    Mere conclusory allegations,

speculation, or conjecture will not avail a party resisting summary judgment.    See Shannon v.

N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).    The non-moving party must produce

"significant probative evidence" demonstrating that a factual dispute does in fact exist, otherwise

summary judgment is appropriate.    Anderson, 477 U.S. at 249.

## C.    Timeliness of Plaintiffs' Federal Claims

First, the Court will determine the timeliness of plaintiffs' federal claims. Then the Court

will turn to the pendant state law claims.

The FHA prohibits discrimination against any person "in the terms, conditions, or

privileges of sale or rental of a dwelling . . . because of race, color, religion, sex, familial status, or

national origin."    42 U.S.C. § 3604(b).    Claims brought under the FHA are governed by a two-

year statute of limitations.    42 U.S.C. § 3613(a)(1)(A).

The parties dispute the proper standard for determining when plaintiffs' claims accrued for

purposes of the statute of limitations.    As explained below, the discovery rule governs when

plaintiffs' claims accrued.    The parties also dispute how the discovery rule applies to plaintiffs'

claims.    Defendants argue that the claims accrued when the Board:    (1) required Mernik Knee

to obtain approval for her inheritance in March 2009; and (2) sued the Knees in state court in

November 2012.    If defendants are correct, the statute of limitations would have expired in

September 2014, at the latest, making the claims untimely.    In the alternative, defendants argue

that the claims accrued as of September 2013 because, by this time, plaintiffs knew about other

Co-op members who were similarly situated, but were not subjected to similar procedural requirements.    Under this theory, the statute of limitations would have expired in September 2015, again making the claims untimely.

Plaintiffs, on the other hand, argue that their claims accrued when they learned about certain Jewish-American comparators during state court discovery in early 2015.    If plaintiffs are correct, the statute of limitations period has not yet expired, and plaintiffs' claims are timely. Alternatively, plaintiffs argue that their claims are continuing violations, which would also make their claims timely.

The Court first addresses the federal standard for claim accrual.    The Court then applies that standard to each of plaintiffs' claims and assesses its timeliness.    The Court then considers whether plaintiffs' claims may be treated as continuing violations.    As explained below, the Court concludes that plaintiffs' claims are untimely.

### 1.    The "Discovery Rule" Standard for Claim Accrual

"Under federal law, a cause of action generally accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action."    M.D. v. Southington Bd. of Educ., 334 F.3d 217, 221 (2d Cir. 2003) (citing Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993), Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980)).    This rule is sometimes referred to as the "discovery rule."    Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002). Courts in this Circuit apply the discovery rule to FHA claims.    See, e.g., Saint-Jean v. Emigrant Mortg. Co., 50 F. Supp. 3d 300, 315 (E.D.N.Y. 2014); Adkins v. Morgan Stanley, No. 12-CV-7667, 2013 WL 3835198, at *5–6 (S.D.N.Y. July 25, 2013); Clement v. United Homes, LLC, 914 F. Supp. 2d 362, 372 (E.D.N.Y. 2012).

12

Defendants argue that the discovery rule only applies to federal claims in limited circumstances, not applicable here.    In particular, they argue that application of the discovery rule is only warranted when a defendant fraudulently conceals a cause of action from a plaintiff.    In support of their argument, defendants rely on several cases involving equitable tolling. Defendants' reliance on these cases is inapposite.    Equitable tolling is an inquiry wholly distinct from the question of when a federal claim accrues and the limitations period begins to run. Equitable tolling asks when a limitations period that has already expired should be tolled to accommodate a plaintiff's claims.    Plaintiffs do not argue that their amended complaint was filed outside of the limitations period, which should be tolled.    Rather, plaintiffs argue that their claims did not accrue until 2015, and so the limitations period has not yet expired.

The parties also dispute how the discovery rule applies to an FHA claim for discrimination. A review of the relevant case law reveals that courts have used different standards when applying the discovery rule.    Generally, courts resolving disparate treatment claims brought under Title VII apply a strict "injury" standard.    Under the "injury" standard, a claim accrues when a plaintiff learns of an adverse action, even if, at that time, a plaintiff does not have reason to suspect that the action was motivated by discrimination.    Carrion v. Coca-Cola Bottling Co. of New England, No. 05-CV-1720, 2006 WL 3526748, at *2–4 (D. Conn. Dec. 1, 2006); see also Singh v. Wells, 445 F. App'x 373, 377 (2d Cir. 2011); cf. Rotella v. Wood, 528 U.S. 549, 555 (2000) ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) ("[A] claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong."); Merill v. S. Methodist Univ., 806 F.2d 600, 605 (5th Cir. 1986)

13

(holding that a court should focus on the date of the act itself, rather than the date the victim first perceives that a discriminatory motive caused the act).    This standard distinguishes between "knowledge of the <u>injury</u> that forms the basis of [a] cause of action and . . . knowledge of <u>other</u> facts that support [a] cause of action."    <u>Heins v. Potter</u>, 271 F. Supp. 2d 545, 555 (S.D.N.Y. 2003) (emphasis in original).

Other courts have applied a "cause of action" standard.    Under this standard, a claim accrues when a plaintiff has discovered enough facts to adequately plead a cause of action and survive a motion to dismiss.    <u>City of Pontiac Gen. Emps' Ret. Sys. v. MBIA, Inc.</u>, 637 F.3d 169, 174–75 (2d Cir. 2011) (citing <u>Merck & Co. v. Reynolds</u>, 559 U.S. 633 (2010)).    This standard was originally applied to claims alleging securities fraud violations.    <u>See, e.g.</u>, <u>Merck & Co.</u>, 559 U.S. 633; <u>City of Pontiac Gen. Emps' Ret. Sys.</u>, 637 F.3d 169.    Although one district court in this Circuit has applied this standard to an FHA claim alleging disparate impact, <u>Saint-Jean</u>, 50 F. Supp. 3d at 314–16, another has cautioned, in an unpublished opinion, against importing this standard from securities fraud cases to other areas of law.    <u>Andrews v. Freemantlemedia N.A., Inc.</u>, No. 13-CV-5174, 2014 WL 6686590, at *6 n.1 (S.D.N.Y. Nov. 20, 2014).

The Court need not resolve the question of which standard should apply to an FHA claim alleging disparate treatment because plaintiffs' claims are untimely under either standard.    The Court applies each standard to the facts presented in turn.

### 2.    Analysis Under the "Injury" Standard

If the "injury" standard applies, then plaintiffs' claims accrued on the dates they learned of the adverse actions taken against them by defendants.    Here, the adverse actions are the requirements for approval, additional financial disclosures, and share transfer that the Board

14

imposed on the Knees.   Accrual does not turn on when plaintiffs acquired enough knowledge to suspect that the Board was acting with a discriminatory motive.

Regarding the Estate Claim, there is no dispute that the Board requested that the Knees transfer the shares out of Kraus's estate and into Mernik Knee's trust in 2012.   Regarding the Board Approval Claim, there is no dispute that the Knees submitted an application for approval in March 2009.   There is also no dispute that the Board requested additional financial disclosures in 2012.   The amended complaint was not filed until January 13, 2016, two years after the limitations period expired.   Accordingly, applying the "injury" standard, both claims are untimely.[5]

### 3.    Analysis Under the "Cause of Action" Standard

If the "cause of action" standard applies, plaintiffs' claims accrued when they discovered enough facts to adequately plead a cause of action sufficient to survive a motion to dismiss. When pleading claims of discrimination, a plaintiff's burden is "minimal."   Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) (citing Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015)).[6]   A plaintiff "need only plausibly allege facts that provide 'at least minimal support for the proposition that the [defendant] was motivated by discriminatory intent.'" Id. (quoting Littlejohn, 795 F.3d at 311); see also Boykin v. KeyCorp, 521 F.3d 202, 215–16 (2d Cir. 2008) (holding that an FHA claim of disparate treatment is sufficiently pleaded where a complaint's allegations "indicate the possibility of discrimination").   When stating a claim under

---

[5] The Court need not resolve whether the claims in the amended complaint relate back to the date of the initial complaint because when measured by either date the plaintiffs' claims are untimely.

[6] Because "FHA disparate treatment claims . . . are analyzed using the McDonnell Douglas burden-shifting framework," the Court may rely on discrimination cases outside of the housing context.   Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008).

15

the FHA, it is often sufficient that a plaintiff, who is a member of a protected class, plead that he or she was treated differently from others, who are not members of that class, but are similarly situated. Boykin, 521 F.3d at 215 ("[I]t is sufficient that [plaintiff's] complaint states that she 'is an African American female,' describes [defendant's] actions with respect to her loan application and alleges that she 'was treated differently from similarly situated loan applicants . . . because of her race, sex, and the location of the property in a predominantly African–American neighborhood.'"). However, identifying others who are similarly situated is not the only way to plead a discrimination claim. Because of the "elusive" nature of intentional discrimination, "plaintiffs usually must rely on 'bits and pieces' of information to support an inference of discrimination, i.e., a 'mosaic' of intentional discrimination." Vega, 801 F.3d at 86; cf. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[W]e conclude that a showing of disparate treatment [by identifying a similarly situated comparator], while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the prima facie case, is only one way to discharge that burden."). Plaintiffs alleging FHA violations need not allege discriminatory animus at the pleading stage. L.C. v. LeFrak Org., Inc., 987 F. Supp. 2d 391, 401–02 n.3 (citing Boykin, 521 F.3d at 215)).

The Court addresses each of plaintiffs' claims under the "cause of action" standard in turn.

   *i. Timeliness of Estate Claim Under the "Cause of Action" Standard*

Plaintiffs' Estate Claim accrued when a plaintiff would have had sufficient information to adequately plead that the Board's demand that Mernik Knee transfer the shares out of her late husband's estate was discriminatory. Defendants argue that the Estate Claim accrued by September 2013—by this time, plaintiffs had revealed in multiple letters to the Board's President

16

that they knew the Board had permitted Jewish-American members of the Co-op to keep their inherited shares in an estate.    Plaintiffs argue that the existence of a non-Jewish Co-op member who was treated more favorably than they were, plaintiffs' reliance on hearsay statements, and plaintiffs' lack of definitive knowledge that the Board was acting with discriminatory intent means that they did not know enough to adequately plead an FHA claim in September 2013.

It is undisputed that the Knees knew as early as July 2012 that another estate left to Jewish-American Co-op heirs was permitted to hold shares.    In their July 2012 letter, the Knees identify the Gottlieb and Jurgens estates, both of which were permitted to hold shares for years.    Plaintiffs argue that the facts cited in the July 2012 letter would not be sufficient for a plaintiff to adequately plead a disparate treatment claim because their knowledge of the Jurgens—non-Jewish heirs who were given more favorable treatment than plaintiffs—undermines the possibility of discrimination. This is not correct—the existence of the Jurgens did not prevent plaintiffs from pleading a discrimination claim.    "[A defendant] may not escape liability for discriminating against a given [plaintiff] on the basis of race simply because it can prove it treated other members of the [plaintiff's] group favorably."    Graham v. Long Island R. R., 230 F.3d 34, 43 (2d Cir. 2000).[7]

Even if the Court were to assume arguendo that the facts in the July 2012 letter are not sufficient to state a claim, plaintiffs' September 2013 letter establishes that they also knew about Mrs. Edelstein, a Jewish-American widow who was permitted to hold her late husband's shares in

---

[7] In their amended complaint, plaintiffs do not allege that the Jurgens were treated more favorably.    In fact, they allege the opposite, and use the Jurgens to bolster their claim that the Board had a history of preferential treatment of Jewish residents.    Contrary to their characterization in the July 2012 letter, the amended complaint alleges: "The Board engaged in a letter writing campaign against the heirs of Dorothy Jurgens, who was not Jewish, to transfer shares that remained in her name after her death, until her legatees finally sold the apartment to escape the harassment." (Am. Compl. ¶ 66.)    The record does not indicate when the plaintiffs learned of the letter writing campaign against the Jurgens.    In any event, whether the Jurgens were treated more or less favorably than plaintiffs is ultimately irrelevant because the Court rests its conclusion on the existence of the Gottliebs and the Edelsteins as proper comparators.

his estate.   Plaintiffs do not argue that Mrs. Edelstein is an inappropriate comparator.   In fact, plaintiffs rely on Mrs. Edelstein as a comparator in their amended complaint.   (Am. Compl. ¶¶ 64–65.)   The Court concludes that the plaintiffs would have been able to adequately plead an FHA violation given the knowledge of Mrs. Edelstein, alone.   See Boykin, 521 F.3d at 215.

Plaintiffs argue that knowledge of Jewish-American comparators is not sufficient to state a claim when that knowledge is based on hearsay.   As Knee explains in his declaration, "In fact, although I had heard that the Edelstein apartment was an estate situation, I had no ability to verify it, and in its response to our counterclaims the Co-op denied that any apartment remained in an estate for more than ten years."   (James Knee Decl. ¶ 35.)   Effectively, plaintiffs contend that hearsay accounts of a comparator need to be verified before a plaintiff can plead them in a complaint.   This is not correct.   Because a Court must accept all factual allegations as true in the complaint for purposes of a motion to dismiss, "whether the statements . . . might constitute inadmissible hearsay when relied upon for the truth of the matters asserted is simply irrelevant." DLJ Mortg. Capital, Inc. v. Kontogiannis, 726 F. Supp. 2d 225, 235 (E.D.N.Y. 2010).

Plaintiffs also argue that they needed to know that the Board was acting with discriminatory intent before their claim could accrue.   This, however, is not the standard for pleading an FHA claim.   A plaintiff need not have definitive knowledge of a defendant's discriminatory animus; a plaintiff need not even plead that a defendant acted with discriminatory animus.   L.C., 987 F. Supp. 2d at 401–02 n.3 (citing Boykin, 521 F.3d at 215)).   All a plaintiff needs to plead an FHA claim is a similarly situated comparator who received more favorable treatment, thus providing at least minimal support for the proposition that a defendant was motivated by discriminatory intent. Vega, 801 F.3d at 86–87.

18

By September 12, 2013, plaintiffs knew of Mrs. Edelstein, a Jewish-American comparator who received more favorable treatment regarding her late husband's estate.   Knowledge of Mrs. Edelstein, coupled with knowledge of the "open secret" regarding the Gottlieb estate would be more than sufficient to state a claim.   Accordingly, plaintiffs' Estate Claim accrued, at the latest, on September 12, 2013.   Plaintiffs had two years to file their Estate Claim.   Because plaintiffs did not file their amended complaint until January 13, 2016, their claim is untimely.[8]

  *ii. Timeliness of Board Approval Claim Under the "Cause of Action" Standard*

Plaintiffs' Board Approval Claim accrued when a plaintiff would have had sufficient information to adequately plead that the Board's demand that Mernik Knee obtain approval for her inheritance was discriminatory.   Defendants argue that the Board Approval Claim accrued in December 2012 when plaintiffs alleged in their state court counterclaim that they were subjected to approval requirements that the Board did not impose on other members of the Co-op.   Plaintiffs argue that they did not discover the facts underlying the Board Approval Claim until February 2015 when certain documents were produced in state court discovery.   In particular, plaintiffs argue that their claim could not have accrued before they learned about the C-5 Widow—the comparator who was not required to obtain Board approval upon inheriting shares.   (See Am. Compl. ¶¶ 59–62.)

It is undisputed that the plaintiffs did not learn about the C-5 Widow until the parties engaged in state court discovery in February 2015.   However, plaintiffs' Board Approval Claim does not rise and fall with the existence of the C-5 Widow and so, this fact is not dispositive.   A plaintiff bringing an FHA claim may rely on circumstantial evidence that provides the necessary

---

[8] Again, the Court need not resolve whether the claims in the amended complaint relate back to the date of the initial complaint because when measured by either date the plaintiffs' claims are untimely.

minimal support for the proposition that the defendant was motivated by discriminatory intent. Identifying a specific comparator—although effective—is not necessary to state a claim.   Vega, 801 F.3d at 86 (noting that plaintiffs often rely on "bits and pieces" of circumstantial evidence to state a claim for discrimination); cf. Abdu-Brisson, 239 F.3d at 468 ("[W]e conclude that a showing of disparate treatment [by identifying a similarly situated comparator], while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the prima facie case, is only one way to discharge that burden."); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37–38 (2d Cir. 1994) (noting the many types of circumstances that could create a permissible inference of discrimination).   If there is enough circumstantial evidence cited in plaintiffs' letters and state court counterclaim such that the plaintiffs would have been able to adequately allege a disparate treatment claim, then their ignorance of a specific comparator is of no consequence.

There is undisputed evidence that plaintiffs knew as early as December 2012 and as late as September 2013 that they were being treated differently as compared to Jewish-American heirs of the Co-op.   In their December 2012 state court counterclaim, plaintiffs allege that they "ha[ve] been singled out for disparate treatment by [the Board]."   They also allege that the Board departed from its own established procedures, and even violated the terms of its lease with plaintiffs, in imposing an approval requirement.   Furthermore, in their September 2013 letter, plaintiffs stated that they were "viciously singled . . . out" when the Board required that they obtain approval before Mernik Knee could inherit her late husband's shares.   This statement comes just a few lines after plaintiffs questioned whether the Board imposed more favorable rules concerning share transfer on Jewish-American Co-op members because of their religion and national heritage.   Although

the Knees suggest that the Court should analyze the Board Approval Claim in a vacuum, facts relevant to the Estate Claim are undoubtedly also relevant to the Board Approval Claim. The Knees were able to raise an inference of discrimination for the Estate Claim because the Gottlieb and Edelstein heirs were appropriate comparators for the Estate Claim. That inference of discrimination also has relevance to the Board Approval Claim. Both claims arise out of the same general transaction—Mernik Knee's inheritance of the two apartments at Round Dune—and involve the same decisionmaker—the Board. It is plausible that a defendant who acts with an improper purpose in delaying a transaction at one stage, acts with a similar purpose when impeding the same transaction at another stage. In other words, if there is evidence that the Board acted with a discriminatory motive when it required that plaintiffs transfer the inherited shares out of Kraus's estate, it is reasonable to suspect that the defendants acted with a similar motive when they required plaintiffs to obtain Board approval. This is especially true where defendants violated lease terms and deviated from established procedures to do so. Cf. Abdu-Brisson, 239 F.3d at 468 (noting that there are several ways to establish an inference of discrimination).

Plaintiffs do not dispute that they made the allegations in the state court counterclaim, nor do they dispute that they knew about the Edelsteins and Gottliebs by September 2013. Rather, plaintiffs insist, as they did with the Estate Claim, that they needed more definitive knowledge that the Board was acting with discriminatory intent. Again, the Court disagrees. All that is necessary for a claim to accrue is discovery of facts from which a plaintiff could adequately plead a claim. Because a plaintiff pleading an FHA claim is not obligated to allege that a defendant acted with discriminatory animus, it would be improper to require subjective knowledge of that fact for the purposes of the discovery rule.

Accordingly, the Court concludes that plaintiffs' Board Approval Claim accrued on September 12, 2013, when plaintiffs had knowledge that they were being treated less favorably than Jewish-American Co-op members, which, combined with their knowledge of other circumstantial evidence, gave rise to a plausible claim of discrimination.   Because plaintiffs' amended complaint was filed on January 13, 2016, four months after the statute of limitations expired, their Board Approval Claim is untimely.[9]

### 4.    The Continuing Violation Doctrine

In the alternative, plaintiffs argue that their claims present continuing violations because they arise, in part, out of a lawsuit that is still ongoing.

Plaintiffs may establish a continuing violation where a discriminatory policy or practice runs into the limitations period.   Havens Realty Corp. v. Coleman, 455 U.S. 363, 380–81 (1982); see also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111 (2002) (holding that a "continuing violation" must involve a discriminatory practice, not serial discrete acts).   Where a continuing violation exists, "the statute of limitations period does not begin to run until the end of the 'last asserted occurrence' of a discriminatory policy."   Clement, 914 F. Supp. 2d at 373 (quoting Havens Realty Corp., 455 U.S. at 381).

Courts in this Circuit are "loath" to invoke the continuing violation doctrine.   Falinski v. Kuntz, 38 F. Supp. 2d 250, 257 (S.D.N.Y. 1999).   The continuing violation doctrine is not appropriate where a plaintiff is able to readily identify the act which harmed her.   See National R.R. Passenger Corp., 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.   Each . . . constitutes a separate actionable

---

[9] Again, the Court need not resolve whether the claims in the amended complaint relate back to the date of the initial complaint because when measured by either date the plaintiffs' claims are untimely.

22

'unlawful employment practice.'"); <u>see also</u> <u>Singleton</u>, 632 F.2d at 192 ("To permit [a plaintiff] to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed . . . would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims."). Additionally, "a continuing violation may not be based on the continuing effects of earlier unlawful conduct or on a completed unlawful act." <u>McFadden v. Kralik</u>, No. 04-CV-8135, 2007 WL 924464, at *7 (S.D.N.Y. Mar. 28, 2007); <u>see also</u> <u>Yip v. Bd. of Trs. of State Univ. of N.Y.</u>, No. 03-CV-959, 2004 WL 2202594, at *5 (W.D.N.Y. Sept. 29, 2004) ("[T]he fact that the plaintiff's ongoing protests, objections, requests for reconsideration, and persistent demands for administrative and judicial review have caused the dispute to linger to the present day" is insufficient to establish a continuing violation). Plaintiffs have not identified any cases in which the filing and prosecution of a lawsuit is considered a continuing violation throughout the duration of the litigation.

Filing a single lawsuit to enforce requirements imposed on plaintiffs, but not imposed on Jewish-American Co-op members, is not a policy or practice which rises to the level of a continuing violation. Rather, filing a lawsuit is a discrete action, isolated and readily discernible by the Knees. Defending against the lawsuit is merely a continuing effect of the filing of that lawsuit, and does not render the lawsuit a continuing violation.

Accordingly, the Court concludes that plaintiffs' claims are not based on continuing violations for which the statute of limitations should be extended. Because the amended complaint is untimely, the Court grants summary judgment on both federal claims.

**D.    The State Law Claims**

Because the Court grants summary judgment on both of plaintiffs' federal inheritance

23

claims, the Court turns to the question of supplemental jurisdiction.  The Court declines to exercise supplemental jurisdiction over the inheritance claims brought under the NYSHRL.

District courts have supplemental jurisdiction over state claims that are "so related" to federal claims such that they "form part of the same case or controversy . . . ."  28 U.S.C. § 1367(a).  Even where such jurisdiction is established, a district court "may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the claim substantially predominates over the claim or claims over which the district court has original jurisdiction . . . ."  28 U.S.C. § 1367(c).

The Court notes that plaintiffs still have a federal claim pending before the Court—their first cause of action alleging familial discrimination in the Co-op's pool policy.  The pool claim, however, is sufficiently dissimilar from the state inheritance claims such that they do not "form part of the same case or controversy."  These claims arise out of two entirely distinct events—the use of a community pool as compared to the inheritance of an apartment—and cannot be said to arise from the same set of operative facts.  Even if the Court were to find that these two claims formed part of the same case or controversy, the Court would decline to exercise supplemental jurisdiction because plaintiffs' state inheritance claims substantially predominate over their pool claim.[10]

Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiffs' state inheritance claims (i.e., plaintiff's fourth and sixth causes of action) and dismisses those claims without prejudice.

---

[10] The Court also notes that the parties are already involved in a breach of contract suit in state court concerning the same transaction at issue in plaintiffs' state inheritance claims.

### III.    CONCLUSION

For the foregoing reasons, defendants' motion for judgment on the pleadings is converted to a motion for summary judgment.   The motion for summary judgment on plaintiffs' federal claims is granted.   Specifically, plaintiffs' FHA claims involving Mernik Knee's inheritance were filed outside of the two-year limitations period and so, are untimely.   Additionally, the Court declines to exercise supplemental jurisdiction over plaintiffs' NYSHRL claims arising out of the inheritance and dismisses those claims without prejudice.

**SO ORDERED.**

Dated: December 19, 2016
Central Islip, New York

                                                       __ /s/ (JMA)_____
                                                       JOAN M. AZRACK
                                                       UNITED STATES MAGISTRATE JUDGE